## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JKB DAIRA, INC.,<br>Plaintiff, | No. 3:20-cv-1564 (SRU) |
| v. | |
| OPS-TECHNOLOGY, LLC, ET AL.,<br>Defendant. | |

### RULING ON MOTION TO DISMISS

This case centers on a dispute between two competitor companies, both of which supply weapons and associated products to a select group of Japanese clients. The plaintiff, JKB Daira, Inc., brought this action in 2020 against a number of defendants, principally alleging that certain of its senior employees had conspired with its competitors to divert lucrative contracts with its current and former customers to those competitors. Nippon Aircraft Supply ("NAS"), the only remaining defendant in the action, now moves to dismiss all remaining claims levied against it for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. For the reasons that follow, the motion to dismiss is **granted in part** and **denied in part.**

## I.       Factual Background

JKB is a New York corporation that maintains a principal place of business in Norwalk, Connecticut. Second Amended Complaint ("SAC"), Doc. No. 96 at ¶ 2. Founded in 1987, JKB is in the business of supplying weapons and associated equipment to a specialized array of clients, including the Japanese Ministry of Defense ("MOD"), the Japan Coast Guard ("JCG"), and the Japanese National Police Agency ("NPA"), among others. *Id.* at ¶¶ 8-9. In order to ensure that its products meet its clients' specialized needs, JKB works closely with the MOD and JCG throughout the product development process, which can take five years or more. *Id.* at ¶¶ 10 -11.

At the end of that lengthy development process, the MOD issues a request for quotes ("RFQ") for a particular product, one that, as a result of the collaborative development process, JKB is often uniquely capable of meeting. *Id.* at ¶ 13. After JKB submits a reply to the MOD's RFQ, the Japanese government issues a formal purchase contract for the product. *Id.* at ¶ 14. Only when it fulfills that contract does JKB earn back the "substantial research and development costs" it has expended during development. *Id.* at ¶ 16.

In 2012, JKB hired Tatsumi Fukasawa as its Manager of International Affairs. *Id.* at ¶ 17. In 2015, Fukasawa was promoted to Vice President of International Affairs, a role he retained until 2020. *Id.* As Vice President, Fukasawa was responsible for: "communicating with JKB's customers regarding current and potential future purchase orders, working on the research and development of JKB's products, serving as Administrator of JKB's computer systems, and coordinating with JKB's Japanese subsidiary." *Id.* JKB avers that, as Vice President, Fukasawa had "access to JKB's trade secrets and customer lists." *Id.*

In February 2014, in connection with his work for JKB and at JKB's expense, Fukasawa traveled to Japan. *Id.* at ¶ 25. While in Japan, and without JKB's knowledge or permission, he visited NAS's Japan office, met with its president and CEO, and entered into a consulting contract with NAS, one of JKB's competitors. *Id.* at ¶¶ 25, 103. The following month, Fukasawa provided NAS with his bank account information so that NAS could pay him for his services. *Id.* at ¶ 26. Between 2014 and 2018, Fukasawa made a number of additional trips to Japan, which were similarly sponsored by JKB. *Id.* at ¶ 27. During the course of those trips, Fukasawa provided NAS with documents and information relevant to "potential contracts with the MOD." *Id.* On one occasion, Fukasawa gave a presentation to NAS's employees regarding the MOD's process of procuring defense equipment. *Id.* at ¶ 28.

In February 2017, NAS Managing Director and Senior Vice President Hiroshi Minami wrote to Fukasawa to discuss the possibility of extending the consulting contract. *Id.* at ¶ 29. In October of that same year, without JKB's knowledge or approval, Fukasawa and NAS entered into a written consulting contract, pursuant to which Fukasawa agreed to "offer services to [NAS] such as giving advice[] and instructions for [NAS's] operation and business planning, etc., in order to contribute to the growth of [NAS]." *Id.* at ¶¶ 30-31; Ex. A, Doc. No. 96-1. In turn, NAS agreed to pay Fukasawa an annual consulting fee of $100,000, with additional "incentive payments" when NAS made a profit based on advice provided by Fukasawa. SAC at ¶ 32. The contract further provided that Fukasawa could use an email address with NAS's domain while working as an employee of NAS, and would be given business cards identifying him as "Corporate Advisor, Business Development and Marketing for NAS." *Id.* at ¶¶ 33-34; *see also* Ex. A, Doc. No. 96-1; Ex. C, Doc. No. 96-3. Fukasawa's work for NAS principally involved sales to acquire new business, maintenance of current business, gathering information from the MOD, and supporting NAS's current clients and those of its American subsidiary, Air Frame Manufacturing & Supply Co., Inc. ("AFM"). SAC at ¶ 42.

JKB alleges ("upon information and belief") that Fukasawa entered into that contract in Connecticut. *Id.* at ¶ 38. In support of that allegation, JKB submits that it "found a copy of the Consulting Service Contract between NAS and Fukasawa on the desktop computer that Fukasawa used in his work for JKB in JKB's Norwalk, Connecticut office." *Id.* JKB further avers that, when NAS entered into the contract with Fukasawa, NAS knew that Fukasawa was employed by JKB, knew that JKB maintained a principal place of business in Norwalk, Connecticut, and knew that Fukasawa worked for JKB in Connecticut. *Id.* at ¶ 20.

In addition, JKB submits that Fukasawa performed the majority of his work for NAS from JKB's Connecticut office, using a desktop computer given to him by JKB. *Id.* at ¶ 23. Specifically, between July 2012 and July 2020, Fukasawa exchanged over four thousand emails with NAS personnel "relating to [his] work for NAS," copies of which JKB discovered on the desktop computer Fukasawa used in JKB's Connecticut office. *Id.* at ¶¶ 24, 39. In addition, Fukasawa sent monthly reports to NAS from Connecticut between 2017 and 2020. *Id.* at ¶ 46.

Fukasawa's work for NAS continued into 2020, even after his promotion to the role of Vice President at JKB. *Id.* at ¶¶ 19, 24. In connection with his work for NAS, Fukasawa sent reports to NAS "discussing opportunities for NAS to obtain contracts to sell firearms and other weapons to JKB's customers," *id.* at ¶ 47, and "suggesting sales strategies, customer analyses, and opportunities for NAS to sell firearms, night vision devices, and other products sold by JKB, including to JKB's customers," *id.* at ¶ 53, and disclosed to NAS confidential information about JKB's customers and products, *id.* at ¶ 47.

In particular, Fukasawa "informed NAS of the opportunity" to sell certain products to those customers from various suppliers that JKB worked with, including Amtec Less-Lethal Systems ("ALS"), SIG Sauer, Beretta, and SAKO. *Id.* at ¶¶ 47-50. Specifically, Fukasawa shared with NAS information regarding the products JKB sold from those suppliers and the customers in Japan to which it sold them. *Id.* Fukasawa also shared with NAS information about specific products JKB was testing or marketing, including the SmartRay X-Ray Vision Systems, *see id.* at ¶ 51, and confidential information regarding certain models of SIG Sauer and Beretta firearms. *Id.* at ¶¶ 54-55. In addition, Fukasawa drafted "product brochures" for NAS to use in promoting its night vision devices, firearms, and ammunition – products that were also sold by JKB. *Id.* at ¶ 57.

In the fall of 2018, Fukasawa recommended that NAS meet with the Japan Ground Self-Defense Force to attempt to sell night vision devices and firearms – products that were also sold by JKB. *Id.* at ¶ 60. Acting on Fukasawa's suggestion, NAS employees arranged the sales meeting. *Id.* at ¶¶ 60-61. In October of that same year, Fukasawa personally attended a meeting with the JCG to discuss potential sales, and followed up the meeting with an email indicating that some of the products he was selling would be handled by NAS. *Id.* at ¶ 62. A few weeks later, Fukasawa sent a second email, this one vouching for NAS's credibility and recommending that the JCG explore opportunities to purchase products from NAS. *Id.* at ¶ 63.

In February 2018, Fukasawa, working from JKB's Connecticut office, sent a memorandum to NAS personnel providing confidential information regarding JKB's customers, including the Japan Ground Self-Defense Force, the Japan Maritime Self-Defense Force, the JCG, and the NPA, and products those customers had previously purchased from JKB, "including night vision devices, breaching kits, Beretta pistols, and SIG Sauer firearms." *Id.* at ¶ 65. Fukasawa asked that the recipients of the email keep the information confidential. *Id.*

In June 2020, the Japan Maritime Self-Defense Force, a long-time customer of JKB, awarded NAS a ¥2,634,500 contract to sell night vision devices, *id.* at ¶ 66, and in November 2020, awarded NAS a ¥6,105,000 contract to sell breaching kits. *Id.* at ¶ 68. In October 2020, the JCG, another longtime customer of JKB, awarded NAS a ¥27,720,000 contract to sell night vision devices. *Id.* at ¶ 67.

In addition, JKB alleges that, in January 2020, AFM sold 10 anti-drone net gun/net launcher systems to the JCG, and again in October 2020, sold 55 of the anti-drone net gun/net launcher systems to the JCG, a product similar to one JKB had previously (and unsuccessfully) marketed to the JCG. *Id.* at ¶¶ 73-75. Both sales were routed through "Ginza Gun Ltd.," a

licensed Japanese consignee that had previously served as JKB's contracting agent. *Id.* at ¶¶ 72 - 74.

## II.    Procedural History

JKB filed this action in 2020 against a number of defendants, and simultaneously filed a motion for a temporary restraining order, preliminary injunction, and a prejudgment remedy. *See* Doc. Nos. 1, 5, 6. After JKB amended the complaint, NAS moved to dismiss the case for lack of personal jurisdiction and failure to state a claim. *See* Doc. No. 63. Thereafter, JKB sought leave to file a second amended complaint, a motion I denied without prejudice to renewal pending resolution of the parties' settlement negotiations. *See* Doc. No. 85.

In October 2021, the case resolved with respect to all defendants save NAS. *See* Doc. No. 92. I held a conference call on the record with the remaining parties—NAS and JKB—to set a scheduling order and discuss next steps. *See* Doc. No. 93. During that call, I granted JKB leave to file a second amended complaint (now, the operative complaint) including only its claims against NAS. *Id.* I additionally granted the parties leave to conduct jurisdictional discovery. *Id.* After NAS filed the instant motion to dismiss (and appended to that motion a copy of its responses to certain of JKB's interrogatories and requests for production), I held a brief call on the record to inquire whether either party sought an evidentiary hearing on the issue of personal jurisdiction. Both parties declined the opportunity for such a hearing. *See* Doc. No. 102.

## III.    Standard of Review

### A.   Rule 12(b)(2)

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a defendant may move for dismissal for lack of personal jurisdiction prior to answering a complaint. Once a defendant has challenged personal jurisdiction by way of a Rule 12(b)(2) motion, "the plaintiff bears the

burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

A district court has "considerable procedural leeway" in addressing such a motion; the court may "determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). "Significantly, however, the showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (cleaned up). "Although . . . the plaintiff has the ultimate burden of establishing jurisdiction over [a] defendant by a preponderance of the evidence . . . until an evidentiary hearing is held, [the plaintiff] need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (cleaned up).

Prior to discovery, a plaintiff may make such a *prima facie* showing by "pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin. Sec, Inc.*, 722 F.3d at 84 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, however, the "*prima facie* showing[] necessary to defeat a jurisdiction testing motion[] must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). At that stage, "[c]onclusory allegations based only on information and belief are not sufficient. Nevertheless, 'a Rule 12(b)(2) motion . . . assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their

sufficiency.'" *New York v. Mountain Tobacco Co.*, 2016 U.S. Dist. LEXIS 8863, at *11 (E.D.N.Y. Jan. 26, 2016) (quoting *Ball*, 902 F.2d at 197).

In a diversity action such as this one, personal jurisdiction "is determined by the law of the forum in which the court sits." *CutCo Indus.*, 806 F.2d at 365. Personal jurisdiction may be either general – grounded in a defendant's "general business contacts with the forum state," *see Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996), or specific, appropriate where the subject matter of the litigation "arises out of, or relates to, the defendant's contacts with the forum." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). Where, as here, a plaintiff claims that the exercise of specific personal jurisdiction is appropriate, a court must engage in a two-step inquiry, considering first whether the appropriate state's long-arm statute authorizes the exercise of personal jurisdiction over a defendant; and second, whether the exercise of personal jurisdiction comports with the Due Process Clause of the United States Constitution. *Thomason v. Chem. Bank*, 234 Conn. 281, 285-86 (1995); *see also Sissel v. Rehwaldt*, 519 F. App'x 13, 17 (2d Cir. 2013).

B.  Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (cleaned up).

Furthermore, in resolving a Rule 12(b)(6) motion, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). In the case at bar, I will consider each of the exhibits appended to the Second Amended Complaint, given that the complaint incorporates each of those documents by reference.

## IV.     Discussion

### A.   Personal Jurisdiction

Before turning to the merits of the parties' arguments, I note that both JKB and NAS were granted leave to engage in jurisdictional discovery. As a result, JKB's *prima facie* showing necessary to defeat NAS's motion requires "an averment of facts that, if credited by the trier [of fact], would suffice to establish jurisdiction." *Ball*, 902 F.2d at 197. More specifically, "'conclusory non-fact-specific jurisdictional allegations' or 'legal conclusions couched as a factual allegation'" are insufficient. *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (summary order) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (cleaned up)); *see also Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (summary order) ("A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place.").

Significantly, JKB has elected not to submit any material garnered during jurisdictional discovery in opposition to the motion to dismiss. NAS, by contrast, has submitted its responses to certain of JKB's interrogatories and requests for production in support of its motion to dismiss, *see* Doc. No. 97-2, a document appropriately considered in resolving the instant motion. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *see also Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, 2018 U.S. Dist. LEXIS 152237, at *34-35 (S.D.N.Y. Sept. 4, 2018). As discussed, however, no evidentiary hearing has been held, and therefore the resolution of any factual disputes is inappropriate at this stage of the proceedings.[1]

---

[1] Given that some of the materials submitted by NAS appear to contest some of the factual allegations set forth by JKB in the complaint, I held a status conference with the parties to determine whether NAS did indeed intend to challenge JKB's factual allegations, in which case I offered to schedule an evidentiary hearing. *See* Doc. No. 102. NAS disclaimed any intent to request an evidentiary hearing (as did JKB). *See id.*

*See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) ("[U]ntil an evidentiary hearing is held, a *prima facie* showing suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion.") (cleaned up); 2 Moore's Federal Practice - Civil § 12.31 (2022) ("[E]ven if the court receives discovery materials, it should not act as fact-finder and should construe all disputed facts in the plaintiff's favor. This approach relies on a prima facie showing and postpones the necessary factual determinations until trial.").

    1.  *Long-Arm Statute*

JKB does not contend that NAS is subject to general jurisdiction in Connecticut, nor do the allegations in the complaint suggest that NAS's "affiliations with [Connecticut] are so continuous and systematic as to render them essentially at home in [Connecticut]." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (cleaned up). Rather, JKB contends that the exercise of personal jurisdiction over NAS is proper pursuant to Connecticut General Statutes section 33-929(f), which governs the exercise of jurisdiction over foreign corporations.[2] JKB maintains that the exercise of jurisdiction is appropriate under both subsection (1) and subsection (4) of the statute, which provide, respectively:

> Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state . . . or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen. Stat. § 33-929(f).

---

[2] For purposes of section 33-929(f), a "foreign corporation" is "a corporation incorporated under a law other than the law of [Connecticut]." Conn. Gen. Stat. § 33-602(18).

As a general matter, section 33-929(f) "confers jurisdiction over designated causes of action without regard to whether a foreign corporation transacts business in Connecticut and without regard to a causal connection between the plaintiff's cause of action and the defendant's presence in this state." *Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 190 Conn. 245, 253-54 (1983).[3]  Instead, the statute requires "a nexus between the cause of action alleged and the conduct of the defendant within the state." *Kaye v. MD TLC, Inc.*, 2018 U.S. Dist. LEXIS 121226, at *9 (D. Conn. July 20, 2018) (cleaned up). Determining whether the exercise of jurisdiction is proper under the statute requires consideration of "the totality of the defendant's conduct and connection with this state . . . to determine whether the defendant could reasonably have anticipated being haled into court here." *Lombard Bros., Inc.*, 190 Conn. 245 at 255; *see also Tekdoc Servs., LLC v. 3i-Infotech, Inc.*, 2009 U.S. Dist. LEXIS 116803, at *9 (D. Conn. Dec. 15, 2009) (quoting *Thomason v. Chem. Bank*, 234 Conn. 281, 291 (1995)).

Prior to reaching the merits of JKB's arguments regarding section 33-929(f), I note that only a plaintiff who is a Connecticut resident or who has a "usual place of business" in Connecticut may avail itself of the provisions of the long-arm statute. Conn. Gen. Stat. § 33-929(f). Here, although JKB is incorporated in New York, it maintains a "principal place of business in Norwalk, Connecticut." SAC at ¶ 2. Accordingly, JKB has standing to invoke the long-arm statute.

Turning first to the propriety of exercising jurisdiction under subsection (f)(4), that section provides that a foreign corporation may be "subject to suit . . . on any cause of action arising . . . out of tortious conduct in [Connecticut], whether arising out of repeated activity or

---

[3] *Lombard* considered section 33-929(f)'s predecessor, Connecticut General Statutes § 33-411(c). Given the nearly identical language used by those provisions, however, "district courts interpreting § 33-929(f) have regularly relied on cases interpreting § 33-411(c)" as guidance for interpreting section 33-939(f). *Schlechtweg v. Celularity, Inc.*, 2022 U.S. Dist. LEXIS 31463, at *9 n.2 (D. Conn. Feb. 23, 2022).

single acts, and whether arising out of misfeasance or nonfeasance." Conn. Gen. Stat. § 33-929(f)(4). Although "the defendant's literal presence in Connecticut when engaging in the actionable conduct," is not required, the allegedly tortious conduct must "be directly and expressly targeted at the forum state." *Gen. Star Indem. Co. v. Anheuser-Busch Cos.*, 1999 U.S. App. LEXIS 29673, at *3-4 (2d Cir. Nov. 8, 1999); *see also Hamann v. Carpenter*, 2017 U.S. Dist. LEXIS 12918, at *23 (D. Conn. Jan. 31, 2017) ("It is not enough that the consequences of the defendants' acts impact a plaintiff in Connecticut; the tortious conduct must be directly and expressly targeted at the forum state to support jurisdiction over a foreign corporation.").

In the case at bar, JKB argues that Fukasawa engaged in tortious conduct in Connecticut—namely, by breaching his fiduciary duties to JKB—"on NAS's[] behalf," thereby conferring personal jurisdiction over NAS. Pl.'s Mem., Doc. No. 98, at 16. As a general matter, Connecticut courts analyzing the reach of section 33-929(f)(4) have recognized that tortious conduct committed by an employee or agent on behalf of a corporation may afford a basis for the exercise of personal jurisdiction under section 33-929(f). *See Knipple v. Viking Commc'ns., Ltd.*, 236 Conn. 602, 609 (1996) (conduct by corporation's agents subjected foreign corporation to personal jurisdiction); *Gelinas v. Smith,* 1991 Conn. Super. LEXIS 2441, at *5 (Super. Ct. Oct. 17, 1991) (allegations that the "tortious acts of the defendant . . . were also made on behalf of [defendant corporation]" and were sufficient to subject the corporation to suit in Connecticut); *Smith v. Snyder*, 2000 Conn. Super. LEXIS 1307, at *13 (Super. Ct. May 22, 2000) (same). Notably, however, "for jurisdictional purposes . . . courts have distinguished an agent from an independent contractor" in determining whether exercise personal jurisdiction over the defendant corporation is appropriate. *Deer Creek Fabrics, Inc. v. Colyer*, 2005 Conn. Super. LEXIS 1821, at *11-12 (Super. Ct. July 19, 2005) (quoting *Rose v. Silver*, 394 A.2d 1368, 1371 (D.C. App.

1978)); *see also Rick v. Montes,* 2022 Conn. Super. LEXIS 198, at *13 (Super. Ct. Feb. 23, 2022) (analyzing relationship between employee and corporation for jurisdictional purposes).

Here, JKB does not specifically plead that an agency relationship existed between NAS and Fukasawa. JKB does allege, however, that the consulting services contract between NAS and Fukasawa identified Fukasawa as an "employee," that Fukasawa was paid a regular, quarterly fee by NAS, that he was permitted to use an email address with NAS's domain, and that he had business cards that identified him as a corporate advisor. Further, the complaint alleges that the actions Fukasawa took from Connecticut—sending NAS communications about JKB's customers and products in order to help NAS divert business opportunities—fell squarely within the scope of his employment duties with NAS. Although the extent to which NAS exercised control over Fukasawa's day-to-day activities is not entirely clear, those allegations are sufficient, in my view, to demonstrate that Fukasawa acted as NAS's agent for purposes of the jurisdictional inquiry.

JKB additionally alleges that Fukasawa committed tortious conduct within Connecticut, namely by sharing from Connecticut JKB's proprietary and confidential information with its competitor, and by assisting that competitor in diverting its business opportunities, all in breach of the fiduciary duties he owed to JKB, his employer. Accordingly, the exercise of personal jurisdiction pursuant to section 33-929(f)(4) is appropriate, and I therefore need not consider whether JKB has met its burden to show that section 33-929(f)(1) affords an alternative basis for exercising jurisdiction.

2. *Due Process*

In addition to satisfying the requirements of the long-arm statute, the exercise of personal jurisdiction over NAS comports with due process. As relevant with respect to a court's power to

14

exercise personal jurisdiction over a particular defendant, "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State.") (quoting *Burger King*, 471 U.S. at 475).

Where, as here, the focus of the inquiry is a state's power to exercise specific—rather than general—jurisdiction over a particular defendant, due process requires that a defendant must have "certain minimum contacts … such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden*, 571 U.S. at 283 (quoting *Int'l Shoe Co.*, 326 U.S. at 316). In other words, there must be some showing that a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'" *Charles Schwab Corp. v. Bank of Am. Corp*., 883 F.3d 68, 84 (2d Cir. 2018) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 n.13 (2014)). Ultimately, for purposes of specific jurisdiction, "the plaintiff's claim must 'arise out of or relate to' the defendant's forum conduct." *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1786 (2017) (Sotomayor, J., dissenting) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

If a defendant has the requisite degree of minimum contacts with a state, a court must consider whether "the exercise of jurisdiction [is] reasonable under the circumstances." *Id.; see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.") (cleaned up). Factors relevant to that analysis include "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the 'interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (5) 'the shared interests of the several States in furthering fundamental substantive social policies.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*, 916 F.3d 143, 151 n.5 (2d Cir. 2019) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). "The primary concern," however, is "the burden on the defendant." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (cleaned up).

Turning first to minimum contacts, JKB principally argues that NAS purposefully directed its actions toward Connecticut by engaging Fukasawa while Fukasawa was employed by JKB in Connecticut. Furthermore, JKB alleges that, during the course of that relationship, NAS emailed Fukasawa while the latter was in Connecticut, and received from him confidential and proprietary information about JKB's customers. Whether those allegations suffice to show that NAS "purposefully avail[ed]" itself of the privilege of conducting activities within Connecticut, or acted to "create a substantial connection with the forum state," *Burger King Corp.*, 471 U.S. at 475 (cleaned up), is a disputed question. In particular, NAS indicates in its discovery responses that it "is entirely unaware of any occasions on which any of its employees, agents, contractors,

or other representatives have entered the State of Connecticut, worked in Connecticut, or resided in Connecticut." Def.'s Mem., Doc. No. 97-1, at 4; *see also* Doc. No. 97-2.

There is no dispute, however, that NAS knew when it hired Fukasawa that he was employed by JKB, and that he worked for JKB in Connecticut. Indeed, the crux of JKB's claim is that NAS chose to employ Fukasawa at least in part *because* he was employed by its competitor. At least for purposes of this stage of the proceedings, those allegations are sufficient, in my view, to demonstrate that NAS "purposefully reached out" into Connecticut. *See Walden*, 571 U.S. at 285-86 (cleaned up); *see also Al Thani v. Hanke*, 2021 U.S. Dist. LEXIS 89748, at *27 (S.D.N.Y. May 11, 2021), such that the exercise of personal jurisdiction comports with the requirements of due process.

Further, I agree with JKB that the exercise of jurisdiction over NAS is reasonable under the circumstances. In particular, the "primary concern," for purposes of the reasonableness analysis, is "the burden on the defendant" occasioned by proceeding in the plaintiff's chosen forum. *Bristol-Myers Squibb*, 137 S. Ct. at 1780. Here, NAS is certainly correct that at least some of the witnesses in this case are located in Japan, and that travel to the United States in order to participate in the litigation would therefore be burdensome. But particularly in light of the availability of remote testimony and the ease by which documents can be electronically transmitted, that burden can be substantially reduced. *Cf. DJ's Tree Serv. & Logging, Inc. v. Bandit Indus., Inc.*, 557 F. Supp. 3d 511, 530 (D. Vt. 2021) (noting defendant's burden was "eased by the conveniences of modern communication and transportation") (cleaned up).

Moreover, given that all causes of action arise under Connecticut law, and that JKB has its principal place of business in Connecticut, JKB has a compelling argument that Connecticut "has a 'manifest interest in providing effective means of redress for its residents.'" *Chloe*, 616

F.3d at 173 (quoting *Burger King*, 471 U.S. at 483). Because JKB's principal place of business is located in Connecticut, the third factor— JKB's interest in obtaining relief— weighs in favor of exercising jurisdiction.

Turning next to the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, much of the evidence and at least some of the witnesses are likely located in Connecticut, given that JKB's maintains a principal place of business in Norwalk. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp*., 84 F.3d 560, 574 (2d Cir. 1996) (noting that courts generally look to the location of evidence and witnesses in considering the efficiency of the forum); *Billie v. Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 342 (D. Conn. 2020) (same). Finally, with respect to policy interests, it does not appear that any particular state has a substantive policy interest in resolving the issues presented here, so that factor is neutral. On the whole, and particularly in light of the potential for modern technology to ease the burden on NAS of litigating in this forum, I therefore agree with JKB that the exercise of jurisdiction over NAS is reasonable.

Because JKB has met its burden, at least for purposes of this early stage of the proceedings, to demonstrate that the exercise of personal jurisdiction over NAS satisfies both the requirements of the relevant long-arm statute and comports with due process, the motion to dismiss for lack of personal jurisdiction is denied.

B.  <u>Failure to State a Claim</u>

NAS additionally moves to dismiss the complaint for failure to state a claim upon which relief can be granted, arguing that each of JKB's claims is legally deficient. The Second Amended Complaint includes five claims, including: (1) Tortious Interference with Business Expectancy; (2) Violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.

Gen. Stat. § 42-110a et seq.; (3) Aiding and Abetting Breach of Fiduciary Duty; (4) Tortious

Interference with Business Relationship; and (5) Civil Conspiracy. I consider NAS's arguments

with respect to each claim in turn.

1.  *Tortious Interference with Business Expectancy*

JKB principally contends that NAS, through its employment of Fukasawa, tortiously

interfered with its business relationships with customers JCG and the Maritime Self-Defense

Force; and with suppliers ALS, SIG Sauer, Beretta, and SAKO. As a result of NAS's

interference, JKB was deprived of five separate sales contracts that it had expected to obtain

from the Japan Maritime Self-Defense Force and the JCG. Specifically, those contracts included:

(1) a June 12, 2020 sales contract with the Japan Maritime Self-Defense for night-vision devices;

(2) a November 27, 2020 sales contract, also with the Maritime Self-Defense, this one for

breaching kits; (3) a January 8, 2020 sales contract with the JCG for 10 anti-drone net gun/net

launcher systems; (4) an October 2020 sales contract with the JCG for 55 anti-drone net gun/net

launcher system; and (5) an October 2020 sales contract with the JCG for night vision devices.

SAC at ¶ 84. Further, JKB alleges that NAS's interference with JKB's relationships with

suppliers ALS, SIG Sauer, Beretta, and SAKO "caused harm to JKB." *Id.* at ¶ 92.

Under Connecticut law, "the elements of a claim for tortious interference with business

expectancies are: (1) a business relationship between the plaintiff and another party; (2) the

defendant's intentional interference with the business relationship while knowing of the

relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho

Tower, Inc. v. Com-Tronics, Inc*., 255 Conn. 20, 27 (2000). In addition, "[a]n action for

intentional interference with business relations requires the plaintiff to plead and prove at least

some improper motive or improper means." *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766,

806 (1999) (cleaned up). In other words, "[t]he plaintiff . . . must demonstrate malice on the part

of the defendant, not in the sense of ill will, but intentional interference without justification." *Id.*

(cleaned up). "Stated simply, to substantiate a claim of tortious interference with a business

expectancy, there must be evidence that the interference resulted from the defendant's

commission of a tort." *Benchmark Mun. Tax Servs., LTD. v. Greenwood Manor*, *LLC*, 194 Conn.

App. 432, 440 (2019) (quoting *Brown v. Otake*, 164 Conn. App. 686, 710 (2016)).

The requirement that a plaintiff plead (and, ultimately, prove) actual loss is of primary

importance; "[u]nlike other torts in which liability gives rise to nominal damages even in the

absence of proof of actual loss[,] it is an essential element of the tort of unlawful interference

with business relations that the plaintiff suffered actual loss." *Am. Diamond Exch., Inc. v. Alpert*,

302 Conn. 494, 510 (2011) (cleaned up); *see also Kelly v. Kurtz,* 193 Conn. App. 507, 531

(2019) ("[I]t is essential . . . that, except for the tortious interference of the defendant, there was a

reasonable probability that the plaintiff would have entered into a contract or made a profit.").

In the case at bar, there is no real dispute that JKB had a prior relationship with both the

JCG and the Japan Maritime Self-Defense Force, or with the suppliers identified; JKB

specifically alleges that all were current or former customers. Rather, the parties dispute whether

JKB has adequately pleaded tortious interference and whether it has made a sufficient showing

that it suffered actual loss. Turning first to whether JKB has alleged intentional interference,

Connecticut courts have looked to the factors identified by the Restatement in determining

whether a particular claim meets the standard. Those factors include:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the
> interests of the other with which the actor's conduct interferes, (d) the
> interests sought to be advanced by the actor, (e) the social interests in
> protecting the freedom of action of the actor and the contractual interests
> of the other, (f) the proximity or remoteness of the actor's conduct to the
> interference and (g) the relations between the parties.

*Reyes v. Chetta*, 143 Conn. App. 758, 764 (2013) (quoting 4 Restatement (Second), Torts § 767 (1979)). Here, JKB principally alleges that, with the purpose of obtaining lucrative sales contracts with the customers of its direct competitor, NAS secretly engaged that competitor's senior-level employee, and aided and abetted his breach of fiduciary duties by obtaining from him confidential information regarding those customers' prior purchases and preferences. Relying on that information, NAS successfully marketed products similar to those sold by JKB to those same customers. Although NAS may certainly be correct that its motive—to divert sales from a competitor—was not improper, the means allegedly employed, in my view, certainly were.

Whether JKB has adequately alleged that it suffered actual loss is a much closer question. As an initial matter, JKB's vague and conclusory allegations that NAS's interference with its suppliers caused it to suffer harm is clearly insufficient to demonstrate actual loss—JKB does not specify the profit or contract it reasonably expected to obtain from those suppliers. Further, although JKB identifies five specific contracts that it claims to have lost as a result of NAS's interference, the factual allegations set forth in support of that claim are thin. In particular, with respect to the contracts JCG awarded to AFM, JKB alleges only that it had, in the past, "attempted to sell" a similar net gun/net launcher system to the JCG. SAC at ¶ 75. With respect to the contracts for night-vision devices and breaching kits, JKB generally alleges that certain of its customers, including the JCG and Japan Maritime Self-Defense Force, previously purchased those products from JKB, and that JKB had "expected to sell additional sets [of night vision devices] in subsequent years to customers including the Japan Maritime Self-Defense Force and the JCG." *Id.* at ¶¶ 65, 70.

The mere fact that JKB had previously sold (or attempted to sell) a particular product to one of its customers does not, however, demonstrate that it reasonably expected to obtain the specific contracts identified in the complaint. Particularly with regard to the contracts AFM allegedly obtained from JCG, JKB's allegations are too conclusory to demonstrate actual loss. With respect to the contracts for night-vision devices and breaching kits, however, JKB does allege that, in February 2020, NAS received from Fukasawa a memorandum providing confidential information regarding prior purchases by the Japan Ground Self-Defense Force and JCG, including night vision devices and breaching kits. Within the next nine months, the JCG and Japan Maritime Self-Defense Force both awarded NAS lucrative contracts for certain of those products. At this stage, the temporal proximity between Fukasawa's alleged disclosure of that information and NAS's subsequent success in obtaining those contracts is sufficient to demonstrate actual loss. Particularly because summary judgment may offer a more appropriate posture in which to revisit whether JKB can carry its burden to demonstrate actual loss, the motion to dismiss the claim for tortious interference is denied. *See, e.g.*, *A&R Body Specialty v. Progressive Cas. Ins. Co.*, 2013 U.S. Dist. LEXIS 26502, at *17 (D. Conn. Feb. 27, 2013) ("The Court may better assess plaintiffs' claim to actual loss on a motion for summary judgment.").

### 2.  *CUTPA*

JKB additionally alleges that NAS's conduct amounted to a violation of CUTPA, in that its conduct in aiding and abetting Fukasawa's breach of fiduciary duty was immoral, unethical, oppressive, and unscrupulous, and caused JKB to suffer substantial financial injury. CUTPA provides, in pertinent part, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Section 110a of the statute defines "trade" and "commerce" as "the advertising, the sale

or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in *this state*." Conn. Gen. Stat. § 42-110a(4) (emphasis added). Although the parties dispute whether JKB has adequately pleaded any of the elements of a CUTPA claim, the central issue, in my view, is whether JKB has adequately alleged that any of NAS's conduct falls within CUTPA's geographic reach.

On that point, JKB argues that Fukasawa's actions in Connecticut—assisting NAS in selling firearms and other weapons, drafting product brochures for NAS, and disclosing to NAS JKB's confidential customer and product information—constitute trade or commerce on behalf of NAS. In support of that argument, JKB proffers the unremarkable proposition that "[a] corporation can act only through its employees." Pl.'s Mem., Doc. No. 98, at 33. The issue, however, is not whether Fukasawa's actions are attributable to NAS, but instead whether JKB has plausibly alleged that Fukasawa engaged in trade or commerce *in Connecticut*. To be sure, "[t]rade or commerce" within the meaning of the statute, is "broadly defined," and, in line with CUTPA's remedial purpose, should be "liberally construed." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995) (cleaned up). Further, the Connecticut Supreme Court has recognized that an employee's actions in usurping corporate opportunities from its current employer may implicate trade or commerce within the meaning of the statute. *See*, *e.g.*, *id*., 232 Conn. at 494; *Fink v. Golenbock*, 238 Conn. 183, 214-15 (1996) (holding that the defendant had engaged in trade or commerce when he engaged in "competitive moves designed to co-opt all of the corporation's options"); *Advanced Copy Techs., Inc. v. Wiegman*, 2016 Conn. Super. LEXIS 1875, at *15-16 (Super. Ct. June 29, 2016) (collecting cases).

In the case at bar, however, the crux of JKB's claim is that Fukasawa, working from Connecticut, assisted NAS by sharing sales strategies, confidential information regarding its customers and products, and drafting product brochures for NAS's use in diverting business opportunities or contracts with JKB's Japanese customers. Pl.'s Mem., Doc. No. 98, at 33. Rather than suggesting that Fukasawa himself engaged in activity implicating trade or commerce in Connecticut, the activities allegedly taken by Fukasawa in Connecticut therefore appear to have been in aid of NAS's solicitation of JKB's customers and business in Japan. For example, the complaint does not appear to allege that Fukasawa actively solicited JKB's customers in Connecticut,[4] or otherwise engaged in conduct that "implicate[d] the service[] of both parties," *Advanced Copy Techs., Inc*., 2016 Conn. Super. LEXIS 1875 at \*16 (cleaned up), within this state. *Cf. Fink v. Golenbock*, 238 Conn. 183, 214 (1996) (holding a CUTPA claim cognizable where "[defendant] took steps to ensure that the plaintiff and the corporation would have no opportunity to engage in the practice of medicine in [Connecticut]"); *Larsen*, 232 Conn. at 494 (holding a CUTPA claim cognizable where defendant's competitive "activities implicated the services of . . . the plaintiff . . . in the New Haven area"). Applying those decisions, JKB has not adequately alleged that any of NAS's conduct falls within CUTPA's geographic reach. *See Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 201 (2013) ("We decline to give extraterritorial effect to § 42-110a (4) for actions taken in the pursuit of trade or commerce occurring wholly outside the state.").[5]

---

[4] Although JKB alleges that Fukasawa at one point met directly with one of its customers to make sales on NAS's behalf, it does not appear to allege that Fukasawa did so in Connecticut. *See* Doc. No. 96 at ¶¶ 62-63; *see also* Def.'s Mem., Doc. No. 98, at 34 (identifying conduct that occurred in Connecticut).

[5] I note that "although employees may be actively engaged in promoting trade or commerce, the actual employment relationship is not itself 'trade or commerce' within the meaning of CUTPA." *Lawler v. Blazawski*, 1998 WL 70590, at \*7 (Conn. Super. Ct. Feb. 11, 1998) (quoting *Banerjee v. Robert*, 641 F.Supp. 1093, 1108 (D. Conn. 1986)).

Citing to a line of cases holding that the conduct forming the basis of a CUTPA claim

need not occur in Connecticut so long as it is "tied to a form of trade or commerce intimately

associated with Connecticut or if, where Connecticut choice-of-law principles are applicable,

those principles dictate application of Connecticut law," *Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F.

Supp. 3d 152, 166 (D. Conn. 2014) (cleaned up), JKB argues that the fact that NAS unfairly

competed with JKB in Japan is irrelevant because the economic impact of that conduct was felt

in Connecticut. In my view, the continued viability of that interpretation of CUTPA is in

question after *Western Dermatology*, a recent Connecticut Appellate Court decision considering

the scope of CUTPA's geographic reach. *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*,

146 Conn. App. 169, 201 (2013). In particular, the Court in *Western Dermatology* took care to

emphasize the "plain meaning" of the phrase "in this state," for purposes of CUTPA, suggesting

that a broader interpretation of CUTPA's geographic reach was unsupportable. *Id.*; *see also Au*

*New Haven, LLC v. YKK Corp.,* 2020 U.S. Dist. LEXIS 135468, at *40-41 (S.D.N.Y. July 30,

2020) (noting that the Appellate Court "could not have been more clear: [t]he meaning of §42-

110b(a) is plain and unambiguous; it proscribes only unfair trade practices occurring within the

state of Connecticut") (cleaned up); *Milteer v. Gabrielle*, 2021 Conn. Super. LEXIS 1373, at *7

(Super. Ct. Aug. 19, 2021) ("whether CUTPA applies depends on whether the alleged unfair or

deceptive acts or practices in the conduct of any trade or commerce, as defined under General

Statutes §42-110a(4), occurred *in Connecticut*") (emphasis added).

Even assuming that a broader interpretation of CUTPA's geographic reach survives,

however, JKB has failed to state a cognizable claim. Although JKB asserts that NAS's conduct

falls within CUTPA's reach because JKB's injury was felt in Connecticut, the only allegation

advanced in support of that claim is that JKB's principal place of business is located in

Connecticut. Pl.'s Mem., Doc. No. 98, at 33. Courts, however, have required more than merely an allegation that a plaintiff's principal place of business is located in this state in order to hold that a claim falls within CUTPA's scope. *See, e.g.*, *PTI Assocs., LLC v. Carolina Int'l Sales Co.*, 2010 U.S. Dist. LEXIS 5922, at *16 (D. Conn. Jan. 26, 2010) ("[P]laintiff's allegations of economic impact within the state are limited to those related to plaintiff's principal place of business being in Connecticut. This limited allegation is insufficient to establish a cause of action under CUTPA.").

Because JKB has failed to adequately allege that NAS (through the actions of Fukasawa or otherwise) engaged in trade or commerce in Connecticut (even assuming a flexible interpretation of CUTPA's geographic reach applies), the claim is dismissed.

### 3. *Aiding and Abetting Breach of Fiduciary Duty*

JKB additionally brings a claim for aiding and abetting a breach of fiduciary duty against NAS. In support of that claim, JKB alleges that Fukasawa owed fiduciary duties to JKB, that NAS was aware of those duties, and that NAS induced Fukasawa to breach those duties by paying him a significant salary to assist NAS in usurping contracts and business opportunities slated for JKB. Under Connecticut (and common) law, a claim for aiding and abetting involves derivative liability for an underlying tort, and therefore depends upon the existence of a valid underlying claim. *Efthimiou v. Smith*, 268 Conn. 499, 505 (2004); *see also Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 109, 121 (D. Conn. 2010) ("[P]laintiffs alleging aiding and abetting liability must prove an underlying tort that defendants allegedly facilitated; it goes without saying that individuals cannot aid and abet themselves."). As such,

before NAS can be deemed liable for aiding and abetting, JKB must establish that Fukasawa

owed—and breached—fiduciary duties to JKB.[6]

A cognizable claim for breach of fiduciary duty requires that a plaintiff allege: (1) that a

fiduciary relationship, "which gave rise to a duty of loyalty and an obligation to act in the best

interests of the plaintiff," existed; "(2) that the defendant advanced his or her own interests to the

detriment of the plaintiff; (3) that the plaintiff sustained damages; and (4) that the damages were

proximately caused by" the breach of fiduciary duty. *Chioffi v. Martin*, 181 Conn. App. 111, 138

(2018) (cleaned up).

Although I agree with NAS that JKB fails to clearly specify what fiduciary duties

Fukasawa owed to JKB, is well settled in Connecticut that "an employee owes his or her

employer a fiduciary duty with respect to matters within the scope of his or her agency."

*Learning Care Grp., Inc. v. Armetta*, 2014 U.S. Dist. LEXIS 137624, at *14 (D. Conn. Sept. 30,

2014); *see also Garden Catering - Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F.

Supp. 3d 117, 136 (D. Conn. 2014) ("[B]y virtue of the employment relationship an employee

owes his or her employer a fiduciary duty."). Here, the complaint identifies Fukasawa as a senior

employee (indeed, a Vice President) of JKB, and alleges that, in that role, he had access to

confidential information about its customers. Further, Fukasawa's duties included, *inter alia*,

"communicating with JKB's customers regarding current purchase orders and potential future

purchase orders," and that he had access to JKB's customer lists. Doc. No. 1 at ¶ 17. Construing

---

[6] There is some uncertainty among Connecticut courts with regard to whether a cognizable claim for aiding and abetting breach of a fiduciary duty requires a plaintiff to plead and prove all of the elements of the underlying tort. *See Garfinkle v. Jewish Family Servs. of Greater Hartford, Inc.*, 2021 Conn. Super. LEXIS 1185, at *14-15 (Super. Ct. July 2, 2021) ("It does not appear that Connecticut's appellate courts have definitively ruled on the issue of whether a plaintiff needs to plead all of the elements of the underlying tort in order to state a legally sufficient aiding and abetting cause of action.") (cleaned up). As a general matter, I agree with the courts that have concluded that there must be a legally sufficient underlying claim for breach of fiduciary duty, given the derivative nature of the claim for aiding and abetting. *See Efthimiou*, 268 Conn. at 504-05. I need not resolve the issue here, however, because JKB plausibly alleges that (1) Fukasawa owed JKB fiduciary duties; (2) Fukasawa breached them by working for NAS; and (3) as a result, JKB suffered harm.

the allegations in the complaint in JKB's favor, it is reasonable to infer that, as a senior-level employee, Fukasawa owed fiduciary duties to JKB. Moreover, based on the description of Fukasawa's duties set forth in the complaint, information relating to those sales contracts presumably fell within the scope of those duties. Finally, the complaint alleges that NAS paid Fukasawa a substantial fee for sharing that information, raising the inference that, in working for NAS, Fukasawa advanced his own interests over those of his employer.

With respect to the fourth element of a claim, JKB must plead—and, ultimately, prove— that Fukasawa's actions were the proximate cause of the damage it allegedly suffered (i.e., the alleged loss of the contracts identified). *See Bozelko v. Papastavros*, 323 Conn. 275, 283 n.10 (2016) ("[A] plaintiff alleging a breach of fiduciary duty must show that any damages sustained were proximately caused by the fiduciary's breach of his or her fiduciary duty."). As discussed above in connection with JBK's claim for actual loss, JKB has demonstrated only a tenuous connection between Fukasawa's conduct and the loss of the contracts identified in the complaint. Construing the allegations in the complaint in JKB's favor, however, the temporal proximity between Fukasawa's disclosure of information relating to products JKB's clients previously purchased and NAS's success in obtaining sales contracts with some of those clients for some of those products is sufficient, at this early stage of the proceedings, to plead the causation element.

Turning next to NAS's liability for aiding and abetting, a cognizable claim requires a plaintiff to plausibly allege that: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) the defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) the defendant "knowingly and substantially assist[ed] the principal violation." *Halo Tech Holdings, Inc. v. Cooper*, 2008 U.S. Dist. LEXIS 24831, at *59 (D. Conn. Mar. 26, 2008) (quoting

*Efthimiou v. Smith*, 268 Conn. 499, 505 (2004)). By sufficiently pleading that Fukasawa breached his fiduciary duties, JKB has met its burden with regard to the first element of its claim. Further, the complaint includes specific allegations suggesting that NAS was aware that Fukasawa, as a senior-level employee, was sharing JKB's confidential or proprietary information without its knowledge or permission. *See* Doc. No. 96. at ¶¶ 4, 55. As a result, JKB has also adequately pleaded the second element of its claim.

Whether JKB has sufficiently pleaded that NAS afforded Fukasawa substantial assistance is a closer question. To determine whether assistance qualifies as "substantial" for purposes of a claim for aiding and abetting, Connecticut courts have looked to the factors set forth in the Restatement, which include: "(1) the amount of assistance given by the defendant; (2) his presence or absence at the time of the tort; (3) his relation to the plaintiff; and (4) his state of mind." *Brunettte v. Bristol Sav. Bank*, 1994 Conn. Super. LEXIS 2132, at *10 (Super. Ct. Aug. 22, 1994); *see also Calibre Fund, LLC v. BDO Seidman, LLP*, 2010 Conn. Super. LEXIS 2619, at *19 (Super. Ct. Oct. 20, 2010).

Here, the complaint alleges that NAS, a competitor of JKB, provided one of its senior employees with a lucrative fee to entice him to share JKB's confidential and propriety information in order to divert certain of its business opportunities. Further, although NAS was not physically present in Connecticut during the course of the employment relationship, JKB alleges that the parties were in routine communication via email, and that Fukasawa made a number of trips to NAS's Japan office, and, during some of those trips, shared with NAS information about JKB's products and customers. In light of those allegations, I am persuaded that – at least for purposes of this stage of the proceedings – JKB has adequately pleaded that

NAS afforded Fukasawa substantial assistance. Accordingly, the motion to dismiss the claim for aiding and abetting a breach of fiduciary duty is denied.

### 4. *Tortious Interference with a Business Relationship*

JKB additionally claims that NAS's conduct constitutes tortious interference with contractual relations, in that NAS knew at the time it contracted to hire Fukasawa that he was employed by its competitor (and, in fact, entered into the contract with him at least in part *because* he was employed by its competitor).  Under Connecticut law, a claim for wrongful interference with another's contractual relations consists of three elements: "(1) a business relationship existed between the plaintiff and another party; (2) the defendant interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 361 (D. Conn. 2014) (quoting *Lawton v. Weiner*, 91 Conn. App. 698, 706 (2005)).

Here, JKB has clearly alleged that it had a business relationship with Fukasawa, given that he was at the time of the events alleged in the complaint a vice president of the company. Further, JKB has plausibly alleged that NAS interfered with that relationship by concurrently employing Fukasawa. (Indeed, it is hard to conceive of a clearer example of interference with an employment relationship than secretly hiring a competitor's senior-level employee). Finally, as discussed above, JKB has set forth sufficient allegations to demonstrate that it suffered actual loss as a result of NAS's actions, in that it lost a number of sales contracts with current or former customers. Accordingly, the motion to dismiss is denied with respect to the claim for tortious interference with a business relationship.

5. *Civil Conspiracy*

Finally, JKB brings a claim for civil conspiracy, alleging that NAS and Fukasawa conspired to deprive it of certain contracts and profits, and that NAS is liable for all acts taken in furtherance of that conspiracy. "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Harp v. King*, 266 Conn. 747, 779 (2003) (citation omitted).

In the case at bar, JKB has failed to set forth sufficient factual allegations to demonstrate that the requisite elements of a claim are met. In particular, JKB does not specifically identify the object of the alleged scheme, nor does it clarify the acts allegedly taken by the parties pursuant to that scheme. Further, in reply to the motion to dismiss, JKB appears to argue that it has alleged a cognizable claim because it has sufficiently pleaded other tort claims. A cognizable underlying tort claim, however, is a necessary—but not sufficient—condition for stating a cognizable claim for conspiracy.

Further, and although neither party addresses the issue, it is not clear to me that JKB can state a viable claim for conspiracy, given that any such claim necessarily requires an agreement between two or more parties. In the case at bar, JKB alleges that Fukasawa was an "employee" of NAS pursuant to the terms of the consulting agreement, and in its memorandum in opposition to the motion to dismiss contends that Fukasawa was either an employee or an independent contractor. Pl.'s Mem., Doc. No. 98, at 17. In accordance with the common-law rule, Connecticut courts have repeatedly held that an agreement between a corporation and its employee or agent is not, for purposes of a conspiracy claim, an agreement between two parties. *Day v. Gen. Elec. Credit Corp.*, 15 Conn. App. 677, 684 (1988). More specifically, because each

31

party "acts for the corporation and the corporation cannot conspire with itself" a conspiracy claim premised on an agreement between a corporation and its agent is not cognizable. *Id.*

To be sure, there are a variety of exceptions to that general rule that may apply here, and dismissal on that basis would therefore not be appropriate at this stage of the proceedings. Instead, the claim is dismissed because JKB has failed to adequately plead the requisite elements. The fact that the claim does not appear cognizable on these facts is simply another factor that weighs in favor of dismissal.

## V.     Conclusion

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is **denied**. The motion to dismiss for failure to state a claim is **granted** with respect to the CUTPA claim and with respect to the claim for civil conspiracy; the motion is **denied** with respect to all other claims.

So ordered.

Dated at Bridgeport, Connecticut, this 27th day of September 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

32